And first, can you please step forward? You're here almost. I think you are. I'm sorry. This is just a representation piece. Can you read it? Can you read it? I'm sure you can. I'm sure you can. I don't know how to get it on your screen. Read it correctly. I think you can find this along. Otherwise, I can't read it. It requires us to write what you told us. And each of us will be sending in its highlights. We're just counting seconds. So we're paused. So we'll be in it 60 minutes at one time. Right. We are representing the campus this year. We can't be here until 2017. Exactly. We have to also have a start with 15 minutes to complete. Thank you. Thank you, John. This is a case where we see very big influencers. And simply, what we want most, of course, is to be rearranged before meeting experts as reasonable as possible. We can't adjacent to possibly a home on, or a house on, you know, a hostel. We have all of these efforts to do this. We have to make this as possible as soon as possible. So that, you know, it would be good for us to be able to address what law enforcement will suggest that we do. And what efforts we're making. You know what I'm talking about. Thank you. Thank you very much. Thank you. And here, we not only just provide a consistent case, but also we're going to utilize funding for a three-minute short. Who doesn't keep their tail and say, this is what the future shows us. Because, obviously, the best response of any talker is it actually goes to a frame of reference. You can see yourselves or anyone else, and you can tell us what's there. Yeah. I mean, she's an amazing talker. And, you know, we have three independent chairs, and you're representing one of them, I should say. And then you have two individuals. And I'm not sure if you know about it, but you know, she's an interior person. And you've talked about that. And four in-house officer groups. Jerry Faulks. Jerry Faulks. Jerry Faulks. Jerry Faulks. Jerry Faulks. I was teaching at the Indian College. I was teaching at OI, and I was one of the head of the IOC. We thought you were. But I heard from the show, and you can see the quality of the people who are described, seen, and heard. And it's fun to see the people you actually see. And you can see your audience, the show, and observe how they're doing. And it's awesome. So, this is for us, and I'm sure you've been informed in part of the jury, but for instance, for example, there was a Supreme Court hearing. I used to speak for the public office, but a lot of these people, they're like messes, you know, they're casting people. They're casting people. I think it's interesting, because I've been around a lot of people, but a lot of them are just messes. So, you're sort of illustrating that, and it's interesting to me. I think it's interesting to me as well. And so, you know, there's a show I'm doing, and there's a party that I attend. And it's interesting. If somebody needs a house, or a church, or a lot of houses, and you think that you are treating a person or a mother as a person, and you simply don't know about it, you're writing a letter to a church party. Certainly, it's trying to be actually doing these specific things, and again, you're requesting some arrangement, and it's interesting to me. And since Sergeant Cooper, she was presenting a bunch of officers who were just kind of looking at the, you know, their questions, their approaches, the sorts that were blocking these people, possibly by fraud, and she was concerned, saw their views, and she said, it's false, or in one way, it is certainly trying to justify whether Sergeant Cooper should be in charge of a church party. Contrarily, as for some arrangements, on the account of each of these decisions, separate decisions, I think, yes, there is a reduction in figuring out what a church party thought and what it was deciding. It's impossible that you can just order and say, these are all things that are very important and obvious, and so, of course, that's what you have to decide. But, that's not the only part of the margin that we should argue here. For instance, a lot of people in the army think that the first thing that they should do is to go to the military, and yet, you don't certainly discuss that. We're supposed to go to the military, and yet, from my perspective, I don't think that this court should order that he be pressed who he was as long as he served long, especially because in many of us, there is, it would be stupid to say that Justin was piloting at least teaching walking law, which, based on his probable cause, he was. Thank you. Just a quick comment. I just didn't recognize you. I think I've heard you before, so I just wondered if you had a relationship with him. I think your relationship with him would have been pretty close. So, just to ask who has the overestimation that he's teaching something that I would have thought to be true. Thank you, Your Honor. We were sitting and we were discussing the issue of whether or not it was true that he was piloting at least for his purpose. It's true, Your Honor, he was teaching that at any point in his life, he would create a terrible experience for his faculty. He was a person that, basically, was really non-separated and untrusted from the board of the department. And so, that's why we ended up addressing the reply for him to our agency. For the first time, really, it was intended for a separate version of him which we were stuck having to explain rather than refer to him as a non-separated person. In the motion for summary yesterday, we listed, basically, he's a person who causes you to hear, well, there's a right to not hear his speech, there's also not the right to follow the law and put yourself in the law
judges: W. Fletcher, Christen, Friedland